**METROPOLITAN SCHOOL DISTRICT OF WAYNE TOWNSHIP, MARION COUNTY, INDIANA, on behalf of itself and all others similarly situated, Plaintiff–Appellee,**

v.

**Robert R. DAVILA, Assistant Secretary, Office of Special Education and Rehabilitative Services, United States Department of Education, Defendant–Appellant.**

No. 91–3386.

United States Court of Appeals, Seventh Circuit.

Argued May 20, 1992.

Decided July 30, 1992.

Rehearing and Rehearing En Banc Denied Sept. 1, 1992.

---

George T. Patton (argued), George E. Purdy, Margaret M. Bannon, Bose, McKinney & Evans, Indianapolis, Ind., for Metropolitan School Dist. of Wayne Tp., Marion County, Ind.

Sue Hendricks Bailey, Asst. U.S. Atty., Indianapolis, Ind., Barbara C. Biddle, Deborah R. Kant (argued), Appellate Section, Sheila Lieber, Philip R. Reitinger, Dept. of Justice, Civ. Div., Washington, D.C., for Robert R. Davila.

Barry A. Zolotar, Joseph R. Symkowick, Roger D. Wolfertz, Sacramento, Cal., for California Dept. of Educ., amicus curiae.

Before BAUER, Chief Judge, POSNER, Circuit Judge, and GIBSON, Senior Circuit Judge.[1]

BAUER, Chief Judge.

In this appeal, Robert Davila on behalf of the United States Department of Education challenges the district court's grant of summary judgment in favor of the Metropolitan School District of Wayne Township and the plaintiff class. The district court held that a letter purporting to interpret part B of the Individuals with Disabilities Education Act, 20 U.S.C. §§ 1411–20 ("the IDEA–B" or "the Act"),[2] was a legislative ruling subject to the notice and comment procedures of the Administrative Procedure Act, 5 U.S.C. § 553 ("APA"). We reverse, and remand for entry of summary judgment in favor of Davila and the Department of Education.

I.

The IDEA–B provides federal funding to states to support the education of disabled children. In order to qualify for funds, a state must establish a policy assuring a free appropriate education ("FAPE") to all disabled children. 20 U.S.C. § 1412(1). Most states distribute the federal monies to local educational agencies that provide services to eligible children. The Office of Special Education and Rehabilitative Services of the United States Department of Education ("OSERS") administers the Act. The rule at issue here was announced by OSERS in a letter written by Davila, the Assistant Secretary for Special Education and Rehabilitative Services, in response to an inquiry from Frank E. New, the Director of Special Education for the Ohio Department of Education.

New asked whether the IDEA requires states to provide educational services to disabled children who are expelled or suspended for an extended period for reasons unrelated to their disability. In his letter, Davila stated that OSERS interpreted the IDEA to require states to continue services in these circumstances. The relevant facts are undisputed: this position was not published in the Federal Register or the Code of Federal Regulations, and public comments were not solicited before it was issued.

The School District for Wayne Township sued the Secretary on behalf of itself and all similarly situated providers of educational services. The School District asserts that OSERS' position places a large financial burden on school districts, and that the districts are entitled to notice of the proposed rule and the opportunity to comment. Both parties filed motions for summary judgment. The district court agreed with the School District that OSERS' position is a legislative rule subject to the notice and comment requirements of the APA. *Metropolitan School District of Wayne Township v. Davila*, 770 F.Supp.

1. The Honorable Floyd R. Gibson, Senior Judge for the United States Court of Appeals for the Eighth Circuit, is sitting by designation.

2. This Act formerly was called the Education of the Handicapped Act of 1975. Congress changed the name, effective October 30, 1990.

1331 (S.D.Ind.1991). The district court acknowledged that "the issue is whether ... the New Letter is a 'legislative rule' requiring notice and comment under the APA, or ... merely an 'interpretive rule' exempt from the APA's requirements." *Id.* at 1337.

The court applied a three-factor test to determine that the position taken in the letter is "substantive," and therefore subject to the notice and comment requirements of § 553 of the APA and to the restrictions of 20 U.S.C. § 1417(b), the section of the IDEA delegating law-making authority to the Department of Education. *Id.* at 1338. These factors were: "(1) it imposes a new and mandatory duty upon all school districts in the United States, (2) the new duty is not expressly required by EHA [now IDEA], and (3) contrary to the New Letter itself it is not required by *Honig v. Doe,* 484 U.S. 305 [108 S.Ct. 592, 98 L.Ed.2d 686] (1988)." 770 F.Supp. at 1338.

We believe the district court used "substantive" as a synonym for "legislative." This usage appears in several other district court opinions, most notably in the one upon which the district court relied to develop its three-factor test. *See National Treasury Employees Union v. Reagan,* 685 F.Supp. 1346, 1356 (E.D.La.1988). *See also Energy Reserves Group v. Federal Energy Administration,* 447 F.Supp. 1135 (D. Kansas 1978). In reviewing (and reversing) *Energy Reserves,* the Temporary Emergency Court of Appeals treated "substantive" in this context as a synonym for "legislative." *Energy Reserves Group v. Federal Energy Administration,* 589 F.2d 1082, 1089 (Temp.Emer.Ct.App.1978). *See also American Hospital Association v. Bowen,* 834 F.2d 1037, 1045 (D.C.Cir.1987). For these reasons, we believe the district court here also used the terms interchangeably.

In addition to its holding that the APA requires OSERS to follow the notice and comment procedures before promulgating the position expressed in Davila's letter to New, the district court found that 20 U.S.C. § 1417(b) requires these procedures. Section 1417(b) provides:

> In carrying out the provisions of this subchapter, the Secretary shall issue, not later than January 1, 1977, amend, and revoke such rules and regulations as may be necessary. No other less formal method of implementing such provisions is authorized.

The district court interpreted this language to require that any rules the Department proposed under the Act be published in the Federal Register. *Id.* at 1337. Based upon its holding that the position announced in Davila's letter to New is "substantive" (legislative), and its reading of § 1417(b), the court concluded that the rule is invalid because OSERS failed to follow the notice and comment procedures of the APA. We find the use of the term "substantive" in this context misleading; an interpretation which explains the meaning of the statute can be just as "substantive" as a legislative rule. We prefer the interpretive/legislative terminology because it avoids any potential confusion.

## II.

It is well established that review of a district court's grant of summary judgment is *de novo. See, e.g., La Preferida, Inc. v. Cerveceria Modelo, S.A.,* 914 F.2d 900, 905 (7th Cir.1990). In order to uphold a grant of summary judgment, we must "view the record and all inferences drawn from it in the light most favorable to the party opposing the motion," *Lohorn v. Michal,* 913 F.2d 327, 331 (7th Cir.1990), and conclude that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). *First Wisconsin Trust Co. v. Schroud,* 916 F.2d 394, 398 (7th Cir.1990).

In this case, we believe Davila and the Department of Education are entitled to judgment as a matter of law. The APA does not require administrative agencies to follow notice and comment procedures in all situations. Section 553(b)(3)(A) specifically excludes "interpretive rules, general statements of policy, or rules of agency

organization, procedure, or practice," from the notice and comment procedures. *See e.g., Ford Motor Credit Co. v. Milhollin,* 444 U.S. 555, 565, 100 S.Ct. 790, 797, 63 L.Ed.2d 22 (1980) (discussing "information letters" containing statements which begin: "The staff's position is ...") (quoted in *Industrial Safety Equipment Association, Inc. v. EPA,* 837 F.2d 1115, 1121 n. 11 (D.C.Cir.1988)). Based upon our review of Davila's letter and controlling authority, we conclude that the letter announced OS-ERS' construction of the IDEA, and hence is an interpretive rule that does not trigger the APA's notice and comment requirements.

■ We note briefly that this issue is ripe for review. Preenforcement review is appropriate here because the Department of Education has issued its final pronouncement on the subject, and the School District and other plaintiffs must either comply with the Department's interpretation or face potential sanctions. The Department's position mandates that states provide educational services to expelled disabled children in order to comply with the IDEA. "If a rule of conduct cannot be challenged in advance of violating it, the people subject to it are placed in a dilemma: comply with a rule that harms them and that they believe to be invalid or violate the rule at the risk of a heavy penalty if they've guessed wrong and the rule is upheld in the penalty proceeding." *Abbs v. Sullivan,* 963 F.2d 918 (7th Cir.1992) (citing 4 Kenneth Culp Davis, *Administrative Law Treatise* § 25:6, at p. 369 (2d ed. 1983)). In this situation, the rule can be challenged directly. *Id.*

"The distinction between interpretive (or 'interpretative') and substantive (or 'legislative') rules is admittedly far from crystal-clear." *Chemical Waste Management, Inc. v. EPA,* 869 F.2d 1526, 1534 (D.C.Cir. 1989) (citing *American Hospital Association v. Bowen,* 834 F.2d 1037, 1045 (D.C.Cir.1987)). *Chemical Waste* considered an EPA interpretation of a regulation which provides: "any solid waste generated from the treatment, storage, or disposal of a hazardous waste, including any

leachate is a hazardous waste." 40 C.F.R. § 261.3(c)(2)(i). The EPA determined that the hazardousness of waste does not depend upon the time of its disposal, and thus materials found to be hazardous after disposal could produce hazardous byproducts requiring treatment. The court found this was a clarification of an existing regulation and hence an interpretive rule. This interpretation required treatment of materials that heretofore had not been covered by the regulation. This new obligation did not render the EPA's reading of the regulation legislative.

■ But we are getting ahead of ourselves. The District of Columbia Circuit, sitting *en banc,* has set forth the general principles to be used to determine whether a rule is interpretive, and, therefore, exempt from APA's notice and comment requirements. The "starting point" of the analysis is the agency's characterization of the rule. *General Motors Corp. v. Ruckleshaus,* 742 F.2d 1561, 1565 (D.C.Cir.1984) (en banc), *cert. denied,* 471 U.S. 1074, 105 S.Ct. 2153, 85 L.Ed.2d 509 (1985); *United Technologies Corp. v. United States Environmental Protection Agency,* 821 F.2d 714, 718 (D.C.Cir.1987). The agency's characterization is not dispositive, but is a relevant factor. *United Technologies,* 821 F.2d at 718; *General Motors,* 742 F.2d at 1565; *see also Friedrich v. Secretary of Health & Human Services,* 894 F.2d 829, 834–35 (6th Cir.) (noting Sixth Circuit's adoption of principles set out in *General Motors* ), *cert. denied,* —— U.S. ——, 111 S.Ct. 59, 112 L.Ed.2d 34 (1990).

After considering the agency's characterization, the *General Motors* court outlined the more general distinction between interpretive and legislative rules:

> An interpretive rule simply states what the administrative agency thinks the [underlying] statute means, and only reminds affected parties of existing duties. On the other hand, if by its action the agency intends to create new law, rights, or duties, the rule is properly considered to be a legislative rule.

*United Technologies,* 821 F.2d at 718 (quoting *General Motors,* 742 F.2d at

1565). The court in *United Technologies* reviewed the *General Motors* holding, finding that "the 'entire justification for the rule [reviewed in *General Motors*] was comprised of reasoned statutory interpretation, with reference to the language, purpose, and legislative history' of the statute." *Id.* In other words, " 'interpretive rules are statements as to what the administrative officer thinks the statute or regulation means,' whereas legislative rules have 'effects *completely independent* of the statute.' " *Id.* (quoting *Cabais v. Egger*, 690 F.2d 234, 238 & n. 9 (D.C.Cir.1982)) (emphasis in original).

This court has noted with approval Professor Davis' test for distinguishing interpretive from legislative rules. *Production Tool v. Employment & Training Administration*, 688 F.2d 1161, 1166 (7th Cir. 1982) (quoting 2 Kenneth Culp Davis, *Administrative Law Treatise* § 7.10 at 54 (2d ed. 1979)). Davis' formulation provides:

> [R]ules are legislative when the agency is exercising delegated power to make law through rules, and rules are interpretative when the agency is not exercising such delegated power in issuing them. When an agency has no granted power to make law through rules, the rules it issues are necessarily interpretative; when an agency has such granted power, the rules are interpretative unless it intends to exercise the granted power....

*Id.* As we pointed out in *Production Tool*, Professor Davis' formulation focuses upon the kind of power the agency is using, and hence the force and effect of the rule. Legislative rules have the force and effect of law—they are as binding upon courts as congressional enactments. *Id.* at 1165. Interpretive rules, although they are entitled to deference, do not bind reviewing courts. *Batterton v. Francis*, 432 U.S. 416, 425–26 & n. 9, 97 S.Ct. 2399, 2405–06 n. 9, 53 L.Ed.2d 448 (1977); *Production Tool*, 688 F.2d at 1165. But this formulation is of limited value when an agency, like the Department of Education, has both delegated rulemaking authority and the power to issue interpretive rules. All agencies charged with enforcing and administering a statute have "inherent authority to issue interpretive rules informing the public of the procedures and standards it intends to apply in exercising its discretion." *Production Tool*, 688 F.2d at 1166 (citing *General Electric Co. v. Gilbert*, 429 U.S. 125, 97 S.Ct. 401, 50 L.Ed.2d 343 (1976)). *See also American Trucking Association, Inc. v. United States*, 688 F.2d 1337, 1341 n. 5 (11th Cir.1982), *rev'd sub nom. on other grounds, Interstate Commerce Commission v. American Trucking Association*, 467 U.S. 354, 104 S.Ct. 2458, 81 L.Ed.2d 282 (1984) (extending agency's authority). Basically, then, this test returns us to the starting point set forth by the District of Columbia Circuit—what kind of rule does the agency think it has promulgated?

Here, Secretary Davila's letter purports to be an interpretation of the IDEA. Davila based the OSERS' interpretation upon the Supreme Court's decision in *Honig v. Doe*, 484 U.S. 305, 108 S.Ct. 592, 98 L.Ed.2d 686 (1988), and other cases interpreting IDEA, the language of both the statute and an implementing regulation (34 C.F.R. § 300.121(a)), and the legislative history of the Act. These are the classic tools a reviewing body, be it court or agency, relies upon to determine the meaning of a statute. Thus, the first factor in our analysis, and an "important" one according to the governing authority, weighs in favor of a determination that the rule is interpretive. *Friedrich*, 894 F.2d at 835.

Under the more general inquiry, we must determine whether the rule merely states what OSERS thinks the statute means, or creates new law, rights, or duties. *Id.; United Technologies*, 821 F.2d at 718. We note that a new position does not necessarily make a rule legislative rather than interpretive. *State of Michigan v. Thomas*, 805 F.2d 176, 182–84 (6th Cir.1986); *Alcaraz v. Block*, 746 F.2d 593, 613–14 (9th Cir. 1984); *American Postal Workers Union v. United States Postal Service*, 707 F.2d 548, 559–60 (D.C.Cir.1983), *cert. denied*, 465 U.S. 1100, 104 S.Ct. 1594, 80 L.Ed.2d 126 (1984).

The district court held that the letter announced a "change in long standing policy of OSERS without a corresponding

change in the underlying statute or regulations." *Metropolitan School District*, 770 F.Supp. at 1337. This holding is factually incorrect and, in this case, legally irrelevant. There is nothing in the record to indicate that OSERS' position is a change in policy—in fact, it appears that the question of whether schools that expel disabled students for reasons unrelated to their disability must continue to provide services, had not been considered before May 1989. In May, a Maryland education official raised the question, and OSERS responded in an unpublished letter that states must continue to provide some form of services. *See* Appellants' Brief at 7. Because there was no published policy, Frank New asked OSERS about the issue when it arose in Ohio.

The School District points to a Memorandum issued by the Office of Special Education Programs (a division of OSERS), to support its argument that the agency's position is a change in policy. *See* Appellees' Brief at 28 (citing Memorandum 87–21, 202 EHLR (Education for the Handicapped Law Report) 372 (June 29, 1987)). The Memorandum lists and answers questions about the Act posed by state special education directors. The School District asserts that the following question and answer state a policy contrary to that announced in the letter to Frank New:

Q. What are the issues and requirements related to suspension and expulsion?

A. This is a complex area in which we are currently better able to articulate the issues than the answers. It is also relevant that the Supreme Court has decided to hear a case involving suspension and expulsion. Supreme Court review was requested by Superintendent Honig of California, and will take place some time after October 1, 1987.

OSEP's position is that a suspension or expulsion of more than ten days' duration constitutes a change in placement which would trigger the procedures and protections of the EHA–B.... Some courts looking at the discipline issue under both EHA–B and

Section 504 [of the Rehabilitation Act of 1973] have said that, when the misbehavior is unrelated to the handicapping condition, the child can be disciplined without regard to the fact that the child has a handicap. This is of interest because the basis for this under the EHA–B is not entirely clear. While this may deserve further thought, OSEP will not apply a rule or guideline contrary to this in the absence of a generally applicable statement distributed in advance to the states.

Memorandum 87–21, 202 EHLR at 374, question 8. But this response only discusses whether a school can suspend or expel a disabled student (for reasons unrelated to his disability), not whether some educational services must be provided once the student is expelled. As counsel for the Department pointed out at oral argument, until recently it was unclear whether disabled children could be disciplined at all under the Act. *Honig v. Doe* resolved this question in the affirmative. 484 U.S. 305, 108 S.Ct. 592, 98 L.Ed.2d 686 (1988). The Memorandum does not support the position that the letter announced a change in longstanding agency policy.

In this case, the treatment of children expelled for reasons unrelated to their disabilities has never arisen. Under the plaintiffs' reasoning, any expression of agency opinion on the subject necessarily would be new and, therefore, legislative. This line of reasoning was rejected implicitly in *American Postal Workers*, 707 F.2d at 558. In that case, the Postal Service changed the computation formula for retirement benefits for its workers. The change in the formula reduced the expected benefits of 113,000 future retirees. *Id.* at 549. Notwithstanding the "newness" of the rule, the court found that the new rule met the "classic definition of an interpretive rule" because it "merely interpreted the term 'average pay' as applied to PTF's [part-time flexible employees] to include only pay actually earned." *Id.* at 559.

Similarly, in *Thomas*, the Environmental Protection Agency refused to accept Michi-

gan's proposed fugitive dust regulations although they were nearly identical to regulations approved five years before. 805 F.2d at 180–81. After it approved the earlier regulations, the EPA modified its definition of "reasonably available control technology ("RACT")." *Id.* at 180. EPA informed the state that it should use the more rigorous definition of RACT. It stated that new information and "increased Agency concern that rules be specific" meant that it might not approve Michigan's proposed rules. *Id.* at 181. This was so even though the statute being interpreted, Part D of the Clean Air Act, 42 U.S.C. § 7502(b)(3), remained unchanged. The Sixth Circuit held that the EPA's revised definition of "reasonably available control technology," which required more detail than the old one, was interpretive. *Id.* at 183. The "definition clearly harmonizes with the language and purpose of ... the Clean Air Act ... and does not create any new law, rights or duties." *Id.* (quotations omitted).

▮ These cases show that an agency's change in its reading of a statute does not necessarily make the rule announcing the change legislative. That rules "may have altered administrative duties or other hardships does not make them substantive [legislative]." *Alcaraz v. Block,* 746 F.2d 593, 613 (9th Cir.1984). Further, as we have pointed out, the issue here is a new one, and the agency's ruling does not constitute a change in policy.

▮ The rule announced in Davila's letter satisfies the general test of an interpretive rule. It relies upon the language of the statute and its legislative history to determine "that Congress did not intend for educational services to cease for children with handicaps who were removed from schools as a result of behavioral problems." Davila Letter at 3, Appellants' Appendix at 19. This represents the paradigmatic case of an interpretive rule. *See United Technologies,* 821 F.2d at 718. OSERS has simply stated what it thinks the IDEA–B requires. *See id.; Production Tool,* 688 F.2d at 1165–67. *See also American Hospital Association v. Bowen,* 834

F.2d 1037, 1045 (D.C.Cir.1987) (interpretive rules "merely explicat[e] Congress' desires"). The rule is based on specific statutory provisions ("all handicapped children"), and its validity stands or falls on the correctness of the agency's interpretation of the statute. In these circumstances, it is clear that the rule is an interpretive one. *See United Technologies,* 821 F.2d at 719–20.

At oral argument, counsel for the School District asserted that Davila's letter to New constituted a legislative rule for three reasons: the Department of Education has delegated law-making authority from Congress; Davila's interpretation is mandatory and binding; and it is a new rule. Unfortunately for the School District, these factors do not control the determination of whether an agency has promulgated a legislative or interpretive rule. We already have discussed and rejected the contention that "new" rules are always legislative. The remaining arguments are also without merit.

Simply because an agency has the power to enact legislative rules does not mean that it has exercised that power. As we have noted, all agencies with power to administer statutes also have the authority to interpret them. *See discussion supra* at 10. If the mere delegation of rule-making authority meant all subsequent agency determinations were legislative, and had to meet the notice and comment requirements of the APA, agency functioning would be hamstrung. The ability to issue interpretive rules "preserve[s] agency flexibility" and "allow[s] agencies to explain ambiguous terms in legislative enactments without having to undertake cumbersome proceedings." *American Hospital Association v. Bowen,* 834 F.2d 1037, 1045 (D.C.Cir.1987). *See, e.g., United Technologies,* 821 F.2d at 714 (EPA has both rule-making authority, yet issued interpretive rule); *American Trucking Association,* 688 F.2d at 1337 (Interstate Commerce Commission has both, issued interpretive rules); *Energy Reserves Group, Inc. v. Department of Energy,* 589 F.2d 1082 (Temp. Emer.Ct.App.1978) (Federal Energy Admin-

istration has both, issued interpretive rules).

The second factor the School District relied upon at oral argument similarly is flawed. All rules which interpret the underlying statute must be binding because they set forth what the agency believes is congressional intent. Could an agency announce, "We think Congress intended this when it enacted this statute, but you don't have to do it."? Courts are not bound by an agency's interpretation, as we have discussed *supra*, but parties regulated by the statute certainly are. *Alcaraz*, 746 F.2d at 614. The court in *Alcaraz* rejected the plaintiff's argument that a binding rule is necessarily a legislative one. *Id.* "[A]ll rules are 'binding' on the regulated parties in the sense that they set, for the time, the legal minima of behavioral standards. The extent to which regulations are 'binding' in comparison to one another, however, is only an effect of the distinction between substantive and interpretive rules, not a criterion of the distinction." *Id.* As we discussed, the nature of the rule dictates the degree of deference it receives from a reviewing court.

Further, as we pointed out in *Production Tool*, "a rule affecting rights and obligations is [not] *ipso facto* legislative." 688 F.2d at 1166. *See also American Postal Workers*, 707 F.2d at 559 (conclusive change in benefits calculation formula is interpretive). "The fact that *burdens* were imposed on ... plaintiffs only goes to the substantial impact of the statute and the regulations, not whether the regulations created law." *Alcaraz*, 746 F.2d at 613. "[P]enalizing the agency for explaining what was for the plaintiffs bad news about [the IDEA], by labeling the explanation 'substantive,' would be like killing the messenger." *Id.* at 614. Davila's letter simply explained what the statute already requires.

■ Prevailing authority rejects the proposition that a rule that has substantial impact is necessarily legislative. *Friedrich v. Secretary of Health & Human Services*, 894 F.2d 829, 836 (6th Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 59, 112 L.Ed.2d 34 (1990); *Industrial Safety Equipment Association, Inc. v. EPA*, 837 F.2d 1115, 1121 (D.C.Cir.1988); *American Postal Workers Union v. United States Postal Service*, 707 F.2d 548, 560 (D.C.Cir. 1983), *cert. denied*, 465 U.S. 1100, 104 S.Ct. 1594, 80 L.Ed.2d 126 (1985). The district court relied in part upon this rationale to find that Davila's letter announced a legislative rule. "[T]he impact of a rule has no bearing on whether it is legislative or interpretative; interpretative rules may have a substantial impact on the rights of individuals." *Id.* at 560. The district court's reliance upon this rationale thus is misplaced.

The district court also found Davila's interpretation of the IDEA was a legislative rule because it found that continuing services are "not expressly required" by the Act. But this rationale again implicitly rejects OSERS' inherent authority to interpret its governing statute. If the IDEA expressly required services to continue after expulsion, there would be no need for OSERS to interpret congressional intent on the subject.

The district court's final reason for holding that OSERS' interpretation of the IDEA was a legislative rather than interpretive rule also misconceives the governing test. The court did not approve of the agency's interpretation of *Honig v. Doe*.

> If the Supreme Court's opinion in *Honig* means what the defendant seems to think it means, i.e., that the Act indeed requires what his letter mandates, then the letter could perhaps be construed as interpretive.

770 F.Supp. at 1338. In other words, because the district court disagreed with OSERS' interpretation of *Honig* and the statute, the interpretation must be legislative, and thus in violation of the APA. The School District also raises this argument on appeal—because *Honig* does not dictate OSERS' interpretation, that 'interpretation' must be legislative. *Honig* did not reach this issue—it noted that students could be suspended for behavior related to their disability that poses an immediate threat to others. 484 U.S. at 325, 108 S.Ct. at 605.

But OSERS' letter did not contend that *Honig* resolved the issue. The district court seems to hold that because *Honig* did not offer the interpretation adopted by OS-ERS, the interpretation must be legislative. This reasoning is in error. Simply because a reviewing court disagrees with an agency interpretation does not render it legislative. An agency has "inherent authority to issue interpretive rules informing the public of the ... standards it intends to apply in exercising its discretion." *Production Tool*, 688 F.2d at 1166. Further, the School District has only challenged the OS-ERS' authority to issue its interpretation, not the interpretation itself. Of course, if the school district were entirely happy with OSERS' reading of IDEA–B, this case would not be before us. Nevertheless, a reviewing court's disagreement with the substance of an agency's interpretive rule does not render the interpretive rule legislative.

Finally, we do not believe that the provision of the IDEA that delegates rulemaking authority to the Department of Education, 20 U.S.C. § 1417(b), requires OS-ERS to promulgate its interpretation of the Act through notice and comment. *See* 770 F.Supp. at 1337. This section was designed to ensure that the rules necessary to implement the Act would be in place early enough to allow states to fulfill their statutory obligations by the effective date of the Act. *See* Appellants' Brief at 5–6. Moreover, as we have discussed, a grant of legislative authority (and the agency's exercise of that authority) does not remove the agency's inherent authority to issue interpretive rules. The School District fundamentally misapprehends § 1417(b), as well as the agency's inherent rulemaking authority. This delegation authorizes legislative rulemaking, it does not revoke interpretive authority.

### III.

For the foregoing reasons, the decision of the district court is REVERSED, and the case is REMANDED for entry of summary judgment in favor of Davila and the Department of Education.